# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| **LISA CAMPBELL,** | } | |
| | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  6:21-cv-01681-MHH** |
| | } | |
| | } | |
| **COMMISIONER OF SOCIAL** | } | |
| **SECURITY ADMINISTRATION,** | } | |
| | } | |
| **Defendant.** | } | |
| | } | |

## MEMORANDUM OPINION

Lisa Campbell seeks judicial review of a final adverse decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).  The Commissioner denied Ms. Campbell's applications for a period of disability, disability insurance benefits, and supplemental security income based on an Administrative Law Judge's finding that Ms. Campbell was not disabled.  Ms. Campbell argues that the Administrative Law Judge—the ALJ—improperly rejected Dr. Tooson's medical opinion regarding the disabling limitations caused by her impairments.  She also argues that the ALJ improperly applied the pain standard and that new and material evidence warrants a remand under 42 U.S.C. § 405(g). (Doc. 14, pp. 1-19).  After careful consideration of the administrative record, for the

reasons discussed below, the Court remands this matter to the Commissioner for further proceedings.

## ADMINISTRATIVE PROCEEDINGS

To succeed in her administrative proceedings, Ms. Campbell had to prove that she was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if [s]he is unable to engage in substantial gainful activity by reason of a medically determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." *Gaskin,* 533 Fed. Appx. at 930 (citing 42 U.S.C. § 423(d)(1)(A)).[1]

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant

---

[1] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited January 17, 2024).

can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136–37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

Ms. Campbell applied for a period of disability, disability insurance benefits, and supplemental security income on February 13, 2020. (Doc. 9-6, pp. 2–8, 9–15). Ms. Campbell alleged that her disability began on November 6, 2019. (Doc. 9-6, pp. 3, 9).[2] The Commissioner initially denied Ms. Campbell's claims on July 9, 2020, and she requested a hearing before an ALJ. (Doc. 9-5, pp. 2, 18-22). Ms. Campbell and her attorney attended a telephone hearing on April 15, 2021. (Doc. 9-3, p. 42). A vocational expert testified at the hearing. (Doc. 9-3, p. 54).

The ALJ issued an unfavorable decision on June 3, 2021. (Doc. 9-3, pp. 18–34). The Appeals Council denied Ms. Campbell's request for review, (Doc. 9-3, pp. 2–4), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g) and § 1383(c).

---

[2] Ms. Campbell previously filed an application for social security benefits, and an ALJ denied the application on November 5, 2019. Because Ms. Campbell did not appeal that decision, the alleged disability onset date for the applications on appeal in this case had to be "the day after" the prior adverse decision. (Doc. 9-4, pp. 2-16; Doc. 9-6, p. 3).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Ms. Campbell's Medical Records*

To support her applications, Ms. Campbell submitted medical records relating to the diagnoses and treatment of Sjogren's syndrome, primary biliary cirrhosis, peripheral neuropathy, chronic kidney disease, iron deficiency anemia, hypothyroidism, hypertension, gastroesophageal reflux disease, depression, anxiety, and fibromyalgia.[3]   The Court has reviewed Ms. Campbell's complete medical

---

[3]  Sjogren's Syndrome is an autoimmune disorder where the immune system attacks the glands that make moisture in the eyes, mouth, and other parts of the body and causes dryness, itchiness, and sensitivity in the eyes and dryness in the mouth.  *See* https://www.niams.nih.gov/health-topics/sjogrens-syndrome#:~:text=Sj%C3%B6gren's%20syndrome%2C%20also%20known%20as,other%20parts%20of%20the%20body (last visited January 17, 2024).

Primary biliary cirrhosis is usually associated with Sjogren's Syndrome.  *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4176406/#:~:text=PBC%20is%20occasionally%20associated%20with,of%20antimitochondrial%20antibodies%20(AMAs) (last visited January 17, 2024).  Primary biliary cirrhosis is a chronic autoimmune disease where chronic inflammation in the liver destroys the bile ducts of the liver and causes liver failure.  The most common symptoms of primary biliary cirrhosis are fatigue, itchy skin, dryness in eyes and mouth, abdominal pain, swelling in the feet and ankles, fluid in the abdomen, jaundice, high cholesterol, diarrhea, hypothyroidism, and weight loss.  Primary biliary cirrhosis is not curable, but early intervention with medication can slow the damage to the liver.  *See* https://www.mayoclinic.org/diseases-conditions/primary-biliary-cholangitis/symptoms-causes/syc-20376874#:~:text=When%20bile%20ducts%20become%20damaged,your%20liver%20are%20slowly%20destroyed (last visited January 17, 2024).

Cirrhosis is "scarring of liver tissue that makes it difficult for your liver to work properly" and may "lead to liver failure."  Cirrhosis "indicates a later stage of primary biliary cholangitis," and people with primary biliary cirrhosis "have a poor prognosis and higher risk of other complications."   *See*   https://www.mayoclinic.org/diseases-conditions/primary-biliary-cholangitis/symptoms-causes/syc-20376874#:~:text=When%20bile%20ducts%20become%20damaged,your%20liver%20are%20slowly%20destroyed (last visited January 17, 2024).

history and summarizes the following medical records because they are most relevant to Ms. Campbell's arguments in this appeal.[4]

In 2009 and 2010, Dr. Charles Wilcox at UAB examined Ms. Campbell and reported suspected primary biliary cirrhosis based on her abnormal liver function test results. (Doc. 9-10, pp. 9, 11–12). In 2012, Dr. Dewayne Tooson, Ms. Campbell's primary care physician, referred Ms. Campbell to Dr. Omar Massoud at Kirklin Clinic at UAB for a hepatology consult. (Doc. 9-9, p. 31). Dr. Massoud reported that a 2012 liver biopsy confirmed that Ms. Campbell had primary biliary cirrhosis. (Doc. 9-9, pp. 31, 34). Dr. Massoud treated Ms. Campbell's cirrhosis at Kirklin Clinic in 2012 and 2013. (Doc. 9-9, pp. 20–36). In a treatment record dated August 31, 2012, Dr. Massoud noted that Ms. Campbell reported that she "stay[ed] fatigued most of the time." (Doc. 9-9, p. 34). Ms. Campbell indicated that she had "some energy in the morning," but by midday, she was "quite tired" and needed "to sit down and rest." (Doc. 9-9, p. 34).[5]

By May 23, 2018, when she saw Dr. Garry Magouirk and his physician's

---

[4] Although Ms. Campbell has a history of depression and anxiety, on appeal, she has not challenged the ALJ's findings regarding her mental limitations. Therefore, the Court has not included a summary of records regarding her mental impairments in this opinion.

[5] Most of the medical records submitted by Ms. Campbell begin in 2018, about a year before her alleged onset date in November 2019. The Court notes a few older records that offer context for Ms. Campbell's more recent opinions.

assistant, JoLee Harkness, Ms. Campbell complained of "increased bruising related to primary biliary cirrhosis." (Doc. 9-8, p. 34). Ms. Campbell requested refills of her cholesterol, blood pressure, depression, and hypothyroidism medications. (Doc. 9-8, p. 34). Ms. Campbell's lab results showed high levels of creatinine and bilirubin. (Doc. 9-8, pp. 36-37).[6] PA Harkness indicated that Ms. Campbell had primary biliary cirrhosis, depression, high cholesterol, hypothyroidism, and a systolic heart murmur. (Doc. 9-8, p. 34).

On September 28, 2018, Ms. Campbell saw PA Harkness and "complain[ed] of chronic itching due to liver disease, and state[d] she ha[d] multiple areas that [would] not heal due to scratching." (Doc. 9-8, p. 31). PA Harkness noted that Ms. Campbell had multiple open sores on her arms in different stages of healing and that her blood pressure was high at 150/80. (Doc. 9-8, pp. 31-32). PA Harkness noted Ms. Campbell's prior diagnoses of primary biliary cirrhosis, hypertension, hypothyroidism, depression, hyperlipidemia, and non-cardiac chest pain. (Doc. 9-8, p. 31). Her medication list at this visit included ursodiol to treat primary biliary cirrhosis. (Doc. 9-8, p. 31).[7] PA Harkness assessed Ms. Campbell with hypertension

---

[6]   High levels of creatinine may indicate that the kidneys are not working properly. *See* https://www.healthline.com/health/high-creatinine-symptoms (last visited January 17, 2024). High levels of bilirubin may indicate "cute or chronic liver disease." *See* https://my.clevelandclinic.org/health/diagnostics/17845-bilirubin (last visited January 17, 2024).

[7]   *See*   https://www.mayoclinic.org/drugs-supplements/ursodiol-oral-route/description/drg-20066618 (last visited January 17, 2024).

and a staff infection. (Doc. 9-8, p. 32). PA Harkness prescribed an antibiotic for the infection and increased Ms. Campbell's blood pressure medication. (Doc. 9-8, p. 32).

On October 19, 2018, Ms. Campbell saw Dr. Magouirk and complained of lingering cold symptoms, a swollen finger, and lesions that itched and burned on the insides of her elbows and below her eye. (Doc. 9-8, p. 28). Dr. Magouirk diagnosed Ms. Campbell with shingles, atopic dermatitis, a bacterial infection of her finger, and seasonal allergies. (Doc. 9-8, p. 28).[8] He prescribed an antibiotic for her infection and an antihistamine. (Doc. 9-8, p. 28).

Lab results for Ms. Campbell from January 11, 2019 indicated high creatinine and bilirubin levels. (Doc. 9-8, pp. 25-26). Ms. Campbell's diagnoses included high cholesterol, depression, hypothyroidism, obesity, high blood pressure, allergic rhinitis, dry mouth, and Sjogren's syndrome. (Doc. 9-8, p. 23). Dr. Magouirk prescribed Plaquenil, gabapentin, vitamin B6, and milk thistle. (Doc. 9-8, pp. 22–

---

[8] Atopic dermatitis or eczema is a chronic disease that can be caused by problems with the immune system and causes inflammation, redness, and extreme itching of the skin. *See* https://www.niams.nih.gov/health-topics/atopic-dermatitis (last visited January 17, 2024).

"Patients with cirrhosis are at a higher risk for developing bacterial infections." *See* https://www.elsevier.es/en-revista-annals-hepatology-16-articulo-bacterial-infections-in-cirrhosis-current-S1665268119322707 (last visited January 17, 2024).

23).[9] Dr. Magouirk suggested that Ms. Campbell increase her fluid intake and use a humidifier to help with dry mouth.  (Doc. 9-8, p. 24).

Ms. Campbell returned to PA Harkness on August 14, 2019.  Ms. Campbell indicated that she could not see a gastroenterologist because of her lack of insurance but hoped she would be "eligible for insurance soon."  (Doc. 9-8, p. 17).  Lab results again indicated high levels of creatinine and bilirubin.  (Doc. 9-8, p. 19).  PA Harkness's assessment included high cholesterol, primary biliary cirrhosis, Sjogren's Syndrome, and atopic dermatitis.  (Doc. 9-8, p. 17).

On November 1, 2019, Ms. Campbell saw Dr. Gregory Stidham in Dr. Magouirk's office and complained of problems sleeping, itching all over her body, sinus problems, a sore on her left hand that would not heal, and brown fingernails. (Doc. 9-8, p. 15).  Dr. Stidham noted that Ms. Campbell was jaundiced and had dark

---

[9]  Plaquenil or hydroxychloroquine is a medication "used to treat certain auto-immune diseases" by reducing swelling, inflammation, and skin problems. *See* https://www.webmd.com/drugs/2/drug-6986/plaquenil-oral/details#:~:text=Tell%20your%20doctor%20right%20away,of%20suicide%2C%20hallucinations)%2C%20hearing (last visited January 17, 2024).

Gabapentin is used in some cases to treat neuropathic pain and restless leg syndrome in patients with cirrhosis. *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2861975/#:~:text=Gabapentin%20is%20unique%20among%20many,anticonvulsant%20in%20patients%20with%20cirrhosis (last visited January 17, 2024); *see also* https://my.clevelandclinic.org/health/drugs/21561-gabapentin (last visited January 17, 2024).

Milk thistle is sometimes used to treat liver conditions. *See* https://www.webmd.com/vitamins/ai/ingredientmono-138/milk-thistle (last visited January 17, 2024).

discoloration to her fingernails.  (Doc. 9-8, p. 14).  Dr. Stidham's assessment included primary biliary cirrhosis, skin pruritis, high cholesterol, peripheral neuropathy, insomnia, and "Stage 3 chronic kidney disease."  (Doc. 9-8, pp. 14-15). Dr. Stidham prescribed gabapentin for pain, trazodone for insomnia, an antihistamine, and antibiotics.  (Doc. 9-8, p. 15).  Dr. Stidham noted that Ms. Campbell was "unable to get ursodiol from [a gastroenterologist] due to lack of insurance" and that Ms. Campbell was unsuccessful in obtaining it directly from the company.  (Doc. 9-8, p. 14).  Dr. Stidham recommended that Ms. Campbell follow up with a gastroenterologist when she obtained medical insurance and restart ursodiol for her primary biliary cirrhosis.  (Doc. 9-8, p. 15).

On December 12, 2019, Ms. Campbell saw Dr. Stidham for sinus problems, drainage in her throat, itching in her eyes and right ear, and coughing.  (Doc. 9-8, p. 10).  Ms. Campbell stated that her symptoms were persistent "for a while" and caused a lack of sleep.  (Doc. 9-8, p. 10).  Dr. Stidham's diagnoses included sinusitis, primary biliary cirrhosis, skin pruritis, and insomnia.  (Doc. 9-8, p. 10).  Dr. Stidham prescribed an antibiotic and increased Ms. Campbell's trazodone dosage from 100mg to 150 mg.  (Doc. 9-8, p. 10).

Ms. Campbell returned to Dr. Stidham on December 17, 2019 and complained that her sinuses were still bleeding even after she finished the antibiotics.  (Doc. 9-8, p. 8).  She requested an increase in her gabapentin prescription.  (Doc. 9-8, p. 8).

Dr. Stidham diagnosed Ms. Campbell with epistaxis, primary biliary cirrhosis, hyperlipidemia, hypothyroidism, and chronic pain. (Doc. 9-8, p. 8).[10] Dr. Stidham increased Ms. Campbell's gabapentin prescription to 400 mg, ordered more labs, and suggested Ms. Campbell use a humidifier and Vaseline to keep her nostrils moist. (Doc. 9-8, p. 8).

Ms. Campbell returned to Dr. Stidham on February 2, 2020 and complained of coughing up discolored sputum, sore throat, headache, and chest and back pain. (Doc. 9-8, pp. 5–6). Dr. Stidham noted Ms. Campbell's history of primary biliary cirrhosis and diagnosed Ms. Campbell with bronchitis and an acute sinus infection. (Doc. 9-8, pp. 5-6). Dr. Stidham prescribed an antibiotic, Mucinex, and a steroid and recommended that Ms. Campbell stay hydrated. (Doc. 9-8, p. 6).

On April 16, 2020, Ms. Campbell returned to Dr. Stidham and complained primarily of insomnia. (Doc. 9-8, p. 126). She also complained of being hot and cold and having numbness in her toes. (Doc. 9-8, p. 126). Dr. Stidham's diagnoses included primary biliary cirrhosis, high cholesterol, hypothyroidism, high blood pressure, insomnia, and peripheral neuropathy. (Doc. 9-8, p. 126). Dr. Stidham replaced trazodone with doxepin for Ms. Campbell's insomnia. (Doc. 9-8, p. 126).

Ms. Campbell saw Dr. Stidham on May 18, 2020 and complained of fever,

---

[10] Epistaxis is the "medical term for a nosebleed." *See* https://my.clevelandclinic.org/health/diseases/13464-nosebleed-epistaxis (last visited January 17, 2024).

back pain, and headaches.  (Doc. 9-8, pp. 123–25).  Ms. Campbell reported that her

back pain was worse when she stood for long periods and that she could not lie flat

on her back.  (Doc. 9-8, p. 123).  Dr. Stidham's diagnoses included allergic rhinitis,

high blood pressure, primary biliary cirrhosis, high cholesterol, hypothyroidism,

obesity, fever, insomnia, and an upper respiratory infection.  (Doc. 9-8, p. 124).  Dr.

Stidham refilled Ms. Campbell's prescriptions and added prescriptions for losartan

potassium for her hypothyroidism and amoxicillin.  (Doc. 9-8, pp. 124–25).

On July 15, 2020, Dr. Mansoor Mehmood at DCH Regional Medical Center

admitted Ms. Campbell for infective endocarditis.  (Doc. 9-8, p. 82).[11]  Ms. Campbell

complained of body pain, fever, chills, and shortness of breath.  (Doc. 9-8, p. 66).

Ms. Campbell had abdominal distention, abdominal pain and weakness, and

"enlarged nodes in the upper abdomen."  (Doc. 9-8, pp. 75, 83).  A CT scan showed

moderate pericardial effusions, bilateral pleural effusions, "hepatic splenomegaly,"

and "[e]xtensive bibasilar airspace opacities."  (Doc. 9-8, p. 75).[12]  Ms. Campbell

---

[11] "Endocarditis is a life-threatening inflammation of the inner lining of the heart's chambers and valves," and it is normally caused by an infection in the bloodstream.  *See* https://www.mayoclinic.org/diseases-conditions/endocarditis/symptoms-causes/syc-20352576 (last visited January 17, 2024).

"Bacterial endocarditis may complicate cirrhosis, may be more frequent in females, typically involves the mitral valve, and probably is due to Staphylococcus aureus."  *See* https://pubmed.ncbi.nlm.nih.gov/8198106/ (last visited January 17, 2024).

[12] Pericardial effusion is the accumulation of excess fluid in the sac that holds the heart.  Kidney disease or cirrhosis of the liver are possible causes of pericardial effusion.  Pericardial effusions can be fatal.  *See* https://my.clevelandclinic.org/health/diseases/17351-pericardial-effusion (last visited January 17, 2024).

underwent a "right thoracentesis" to drain the pleural effusion.  (Doc. 9-8, p. 76). She remained in the hospital for 12 days.  (Doc. 9-8, p. 66).

Dr. Disha Italiya, who treated Ms. Campbell in the hospital, noted that her acute respiratory failure with hypoxia was "likely due to pleural effusion" and that Ms. Campbell was weaned off oxygen by discharge.  (Doc. 9-8, p. 67).  Dr. Italiya ordered a peripherally inserted central catheter for Ms. Campbell to receive antibiotics for a month at home; recommended that Ms. Campbell consult with an interventional radiologist about her thoracentesis; and indicated that Ms. Campbell needed to "continue diuresis."  (Doc. 9-8, p. 67).  Dr. Italiya noted that the pericardial effusions needed continual monitoring.  (Doc. 9-8, p. 67).

Dr. Italiya expressed concern that Ms. Campbell's macrocytic anemia had "acutely worsened."  (Doc. 9-8, p. 67).  Dr. Italiya indicated that the initial concern was "for [a] possible upper GI bleed with [history of] cirrhosis," but that the fecal

---

"Pleural effusion, sometimes referred to as 'water on the lungs,' is the build-up of excess fluid between the layers of the pleura outside the lungs."  One of the most common causes of pleural effusion is cirrhosis.  *See* https://my.clevelandclinic.org/health/diseases/17373-pleural-effusion-causes-signs--treatment (last visited January 17, 2024).

"Hepatosplenomegaly (HPM) is a disorder where both the liver and spleen swell beyond their normal size, due to one of a number of causes."  *See* https://www.healthline.com/health/hepatosplenomegaly (last visited January 17, 2024).

"Bibasilar atelectasis is when there is a collapse in the bottom part of both lungs" that can be caused by pleural effusions.  *See* https://www.medicalnewstoday.com/articles/322027 (last visited January 17, 2024).

blood test was negative, and Ms. Campbell had "no gross bleeding." (Doc. 9-8, p. 67). Dr. Italiya consulted with Dr. Jennifer Palmer, a gastroenterologist at DCH, regarding Ms. Campbell's macrocytic anemia and noted that Ms. Campbell received three doses of iron via an IV. (Doc. 9-8, pp. 67, 72-78, 82-90).[13]

Dr. Palmer noted Ms. Campbell's diagnosis of primary biliary cholangitis and indicated that Ms. Campbell had been noncompliant on ursodiol for seven years because she did not have insurance coverage. (Doc. 9-8, pp. 82-83). Dr. Palmer noted that Ms. Campbell had last seen Dr. Tooson in 2018. (Doc. 9-8, p. 82). Dr. Palmer indicated that Ms. Campbell's liver disease "likely progressed to cirrhosis with acute decompensation likely due to endocarditis." (Doc. 9-8, p. 78). Dr. Palmer indicated that following treatment for infective endocarditis, Ms. Campbell would need an esophagogastroduodenoscopy. (Doc. 9-8, p. 83).[14] Dr. Palmer suggested that Ms. Campbell seek continued medical monitoring for anemia and gastrointestinal bleeding as a possible sign of acute liver failure and that she take ursodiol for her cirrhosis. (Doc. 9-8, pp. 78, 83).

Dr. Italiya noted Ms. Campbell's abdominal lymphadenopathy and expressed

---

[13] Macrocytic anemia is where red blood cells are abnormally large and unable to carry sufficient oxygen through the body; a common cause of macrocytic anemia is liver disease. *See* https://www.medicalnewstoday.com/articles/321620#causes (last visited January 17, 2024).

[14] An esophagogastroduodenoscopy is a procedure that assesses the lining of the esophagus, stomach, and small intestine. *See* https://medlineplus.gov/ency/article/003888.htm (last visited January 17, 2024).

"a concern of lymphoma due to [Ms. Campbell's] history of Sjogren's syndrome." (Doc. 9-8, p. 68). Dr. Italiya told Ms. Campbell to follow up with oncology for a PET scan after she completed her antibiotic treatment. (Doc. 9-8, p. 68). Dr. Italiya recommended that Ms. Campbell receive physical therapy at a skilled nursing facility but recognized that the option was not available because Ms. Campbell was uninsured. Dr. Italiya indicated that Ms. Campbell would have to use a walker, cane, or crutch at home to ambulate, and Ms. Campbell stated that she had a walker at home. (Doc. 9-8, pp. 68–69). Upon discharge on July 27, 2020, Dr. Italiya prescribed two diuretics and 300 mg of ursodiol three times a day. (Doc. 9-8, pp. 70-71).

On August 5, 2020, Ms. Campbell saw Dr. Stidham for a follow-up after her hospital visit. (Doc. 9-8, p. 117). Dr. Stidham noted that Ms. Campbell had stage 3 chronic kidney disease. (Doc. 9-8, p. 118). Dr. Stidham referred Ms. Campbell to G.I. Associates of West Alabama, and Ms. Campbell saw PA Marlar there on August 12, 2020. (Doc. 9-8, p. 95). PA Marlar noted that Ms. Campbell's symptoms had improved since her discharge from the hospital. (Doc. 9-8, pp. 95, 97). PA Marlar noted that Ms. Campbell was in a wheelchair, looked older than her age, and "appear[ed] chronically ill." (Doc. 9-8, p. 97). PA Marlar assessed that Ms. Campbell suffered from chronic iron deficiency anemia, primary biliary cirrhosis, endocarditis, and GERD. (Doc. 9-8, p. 97). Ms. Campbell reported that she had

been unable to fill her ursodiol prescription because she did not have insurance, wanted to fill the prescription at a clinic in Birmingham, and hoped to "gain assistance with medication."  (Doc. 9-8, pp. 97-98).  PA Marlar stated that Ms. Campbell required "Moderate to High Severity care," that her diagnosis and management options were extensive, and that the "level of risk" was moderate. (Doc. 9-8, p. 98).

Ms. Campbell saw Dr. Anand Pandey, a cardiologist at Alabama Heart Care, on September 10, 2020 for the results of an August 25, 2020 cardiac catheterization and echocardiogram.  (Doc. 9-8, pp. 133-36, 140).  Dr. Pandey noted that the cardiac catheterization showed mild coronary artery disease and moderate mitral regurgitation.  (Doc. 9-8, p. 133).  During the visit, Ms. Campbell did not have cardiac symptoms.  Dr. Pandey recommended a follow-up in four months.  (Doc. 9-8, p. 133).

Also in September 2020, upon referral from Dr. Stidham, Ms. Campbell saw Dr. Tooson at G.I. Associates of West Alabama for severe anemia.  (Doc. 9-8, p. 91).[15]  Dr. Tooson noted that Ms. Campbell had been diagnosed with anemia one month earlier and "required oral iron tablets for replacement therapy."  (Doc. 9-8, p. 91).  Ms. Campbell complained of abdominal pain, arthritis, brittle nails, fatigue,

---

[15]  Dr. Tooson previously treated Ms. Campbell between 2012 and 2018.  (Doc. 9-8, p. 82; Doc. 9-9, p. 31).

sleep apnea, palpitations, and ice cravings. (Doc. 9-8, p. 93). Ms. Campbell did not have abdominal swelling, black stools, change in her bowel habits, constipation, diarrhea, dysphagia, gas, heartburn, jaundice, nausea, rectal bleeding, stomach cramps, vomiting, vomiting blood, or blood in her stool. (Doc. 9-8, p. 93). Dr. Tooson noted that Ms. Campbell had a frail appearance and that she was "thin, not cachectic." (Doc. 9-8, p. 93).[16] Dr. Tooson diagnosed Ms. Campbell with primary biliary cholangitis and stated that her infective endocarditis "was resolved." (Doc. 9-8, p. 93). Dr. Tooson continued Ms. Campbell on ursodiol and referred her to Dr. Fettig, a liver specialist. (Doc. 9-8, p. 91). Dr. Tooson rated the level of risk associated with Ms. Campbell's condition as "extensive." (Doc. 9-8, p. 93).

On October 22, 2020, Ms. Campbell saw Dr. Stidham and complained of "coughing up pale yellow sputum." She also complained of a runny nose and headaches. (Doc. 9-8, p. 103). Dr. Stidham indicated that Ms. Campbell had bronchitis, and he noted diagnoses of primary biliary cirrhosis, high blood pressure, high cholesterol, and "stage 3 chronic kidney disease." (Doc. 9-8, p. 104). Dr. Stidham refilled prescriptions, added prescriptions for an antibiotic and Lasix, and ordered labs for Ms. Campbell. (Doc. 9-8, p. 105).

On December 20, 2020, Ms. Campbell saw Dr. Michael Fettig, a liver

---

[16] Cachexia is "general physical wasting and malnutrition usually associated with chronic disease." *See* https://www.merriam-webster.com/dictionary/cachexia (last visited Feb. 9, 2024). Someone described as "cachectic" is affected by cachexia.

specialist at the Kirklin Clinic at UAB.  (Doc 9-9, pp. 8–11).  Dr. Fettig noted that Ms. Campbell was "doing well with monotherapy" with ursodiol, and she was not symptomatic the day of her visit, but her "enzymes [were] still elevated."  (Doc 9-9, p. 8).  An abdominal ultrasound showed that Ms. Campbell had an enlarged liver, "[h]epatomegaly and cirrhosis," and abnormal "monophasic hepatic venous waveforms, which [was] common in the setting of cirrhosis."  (Doc. 9-9, pp. 6-7).  Dr. Fettig noted that Ms. Campbell's cirrhosis was "compensated," and her renal function was "stable."  (Doc 9-9, p. 9).[17]  A biopsy supported a diagnosis of stage II primary biliary cirrhosis and indicated "transplant potential."  (Doc 9-9, pp. 10-11).  Dr. Fettig faxed the reports from his visit with Ms. Campbell to Dr. Tooson.  (Doc. 9-9, p. 11).

### *Chronic Fatigue Medical Source Statement*

On September 14, 2020, Dr. Tooson completed a chronic fatigue medical source statement regarding Ms. Campbell.  (Doc. 9-8, pp. 52–54).  Dr. Tooson indicated that he had treated Ms. Campbell on more than five occasions.  (Doc. 9-8, p. 52).  Dr. Tooson stated that Ms. Campbell suffered from chronic fatigue syndrome and primary biliary cholangitis and that her prognosis was "guarded."  (Doc. 9-8, p. 52).  Dr. Tooson explained that Ms. Campbell would be on "chronic life-long

---

[17] Ms. Campbell's right kidney was "congenitally absent."  (Doc. 9-9, p. 6).  Her left kidney was normal in size.  (Doc. 9-9, p. 6).

medical treatment" for "intractable pruritis," sleep problems, fatigue, and jaundice. (Doc. 9-8, p. 52).

Dr. Tooson opined that Ms. Campbell's severe fatigue, constant itching, and sleep deprivation would "constantly" "interfere with the attention and concentration needed to perform even simple work tasks"; that she could not perform "even low stress jobs"; that she could not sit longer than four hours at a time, stand longer than two hours at a time, and needed a job that allowed her to shift positions at will; and that she needed breaks every hour for one or two hours each to sit or lie down. (Doc. 9-8, pp. 52-53). Dr. Tooson indicated that Ms. Campbell would miss work four or more days each month because of her impairments or treatments. (Doc. 9-8, p. 53). Dr. Tooson noted that Ms. Campbell's symptoms and limitations dated to September 2012. (Doc. 9-8, p. 54).[18]

### *Fatigue Questionnaire and Function Report*

At the request of the Social Security Administration, on March 9, 2020, Ms. Campbell completed a fatigue questionnaire and a function report. (Doc. 9-7, pp. 35-37). In her fatigue questionnaire, Ms. Campbell stated that she had problems sleeping and took a nap for 30 to 60 minutes each day. (Doc. 9-7, p. 35). She indicated that she did not have difficulties caring for her personal needs, could

---

[18] Ms. Campbell's records from the Kirklin Clinic at UAB indicate that Dr. Tooson consulted with Dr. Ali Safdar Khan in 2012 regarding Ms. Campbell's primary biliary cirrhosis and her issues with severe fatigue. (Doc. 9-9, p. 31).

perform light cleaning, could grocery shop once each week, and could complete chores. (Doc. 9-7, pp. 35–36). She stated that she could not stand longer than 30 minutes at a time and needed a break for 15 to 30 minutes "before continuing a task or activity." (Doc. 9-7, pp. 35–36). Ms. Campbell stated that because of her fatigue, she could not work full-time and could not work more than the one eight-hour shift a week she had been working. (Doc. 9-7, p. 37). Ms. Campbell stated that "before [her] illness [she] didn't have any problems or limitations on work or housework or yardwork." (Doc. 9-7, p. 37).

In her function report, Ms. Campbell stated that she could not be still when she laid down, she itched all night, she had pain in her feet and legs, and she had stiff joints. (Doc. 9-7, p. 51). Ms. Campbell stated that she could prepare her own meals like sandwiches, frozen dinners, or a meat with two vegetables. (Doc. 9-7, p. 52). Ms. Campbell stated that she did not cook as much as she did before her impairments because of pain in her hands. (Doc. 9-7, p. 52). Ms. Campbell stated that she did laundry but had difficulty holding the laundry basket, washed dishes, and did light cleaning. (Doc. 9-7, pp. 40, 52). Ms. Campbell indicated she could walk, drive, and grocery shop alone. (Doc. 9-7, p. 53). Ms. Campbell reported that she read and watched television and movies with no problems. (Doc. 9-7, p. 54). Ms. Campbell explained that she had difficulty using her hands because of neuropathy, and she could lift only 10 pounds; could sit for 30 minutes at a time;

and had difficulty lifting, bending, standing, kneeling, climbing stairs, following directions, and concentrating for more than 20 minutes. (Doc. 9-7, p. 55).

### *Third-Party Function Report*

Ms. Campbell's friend and boss, Cherri Koester, completed a third-party function report on June 14, 2022. (Doc. 9-7, p. 63). Ms. Koester indicated that she had known Ms. Campbell for 20 years, saw Ms. Campbell usually two days per week, and helped Ms. Campbell around the house. (Doc. 9-7, p. 63). Ms. Koester reported that in the 12 months preceding her report, Ms. Campbell had "deteriorated" and had experienced "major changes in her physical abilities." (Doc. 9-7, p. 70). Ms. Koester indicated that Ms. Campbell no longer could "work, travel, [do] all household chores, work in the garden, and exercise." (Doc. 9-7, p. 64). Ms. Koester stated that Ms. Campbell sometimes could not "get out of bed due to pain and exhaustion." (Doc. 9-7, pp. 65–66).

Ms. Koester reported that Ms. Campbell slept "very little" because of "pain, itching, and general discomfort"; tired easily; was jaundiced; was "always exhausted"; hurt all the time; and itched "horribly." (Doc. 9-7, pp. 64, 70). Ms. Koester stated that Ms. Campbell could not stand for long periods, could not do much physical activity, and spent "a lot of time sitting or laying down." (Doc. 9-7, p. 67).

### *Ms. Campbell's Administrative Hearing*

The ALJ held Ms. Campbell's telephone hearing on April 15, 2021.  (Doc. 9-3, pp. 40–58).  Ms. Campbell testified that she had lived with her mother for four years and that her mother helped her a lot.  (Doc. 9-3, p. 53).  Ms. Campbell stated she had not worked since March of 2019.  (Doc. 9-3, p. 45).

Ms. Campbell testified that she had chronic fatigue, pain in her stomach, and swelling because of her chronic liver and kidney diseases.  (Doc. 9-3, p. 45).  Ms. Campbell stated that her liver disease caused itching and that she took a medication that helped with the itching "[m]ost of the time."  (Doc. 9-3, pp. 45, 52).  She indicated that she took "ursodiol three times a day" and a cholesterol medication to help with her liver function.  (Doc. 9-3, p. 53).[19]  Ms. Campbell indicated that her doctors were monitoring her liver to prevent the final stage of liver disease as long as possible.  (Doc. 9-3, p. 53).  Ms. Campbell testified that at the time of her hearing, her liver was "not to the point yet of doing a transplant."  (Doc. 9-3, p. 53).

Ms. Campbell testified that her chronic kidney disease caused swelling and bladder issues.  (Doc. 9-3, pp. 45–46).  She stated that she took Lasix to "keep the fluid down."  (Doc. 9-3, p. 52).  Ms. Campbell explained that the Lasix caused her to go to the bathroom frequently.  (Doc. 9-3, p. 48).  On a good day, Ms. Campbell

---

[19]  The medical record does not indicate how Ms. Campbell was able to afford ursodiol after years of not taking it because of lack of insurance coverage.

said she used the bathroom eight times, and on a bad day, she needed to go to the bathroom "like, every 15 minutes" and had to "hurry up and get there." (Doc. 9-3, p. 48). Ms. Campbell testified that the swelling caused pain in her back and legs. (Doc. 9-3, p. 47). Ms. Campbell stated that she could take only Tylenol for pain because stronger pain medications would damage her liver. (Doc. 9-3, pp. 47-48).

Ms. Campbell stated that she did not sleep well because of her frequent trips to the bathroom, her liver and kidney pain, and her restless leg syndrome; that she slept for three hours on a good night; and that she did not sleep at all on a bad night. (Doc. 9-3, p. 46). Ms. Campbell testified that her doctors tried to give her medication to help her rest better at night, but they had difficulty finding medications that would not worsen her liver and kidney disease. (Doc. 9-3, p. 47). She stated that no medications she tried had worked. (Doc. 9-3, p. 47).

Ms. Campbell testified that on a normal day, she woke up around 7:00 in the morning, made breakfast, and had to lie down afterward for 45 minutes to an hour. (Doc. 9-3, p. 49). Ms. Campbell stated that she could do her own personal hygiene. (Doc. 9-3, p. 51). Ms. Campbell testified that because of her fatigue, she could did only small chores around the house, and once she completed a small task—like a load of laundry—she had to lie down for 30 to 45 minutes to rest before she could do another task. (Doc. 9-3, pp. 49–51).

Ms. Campbell testified that two months before the hearing, she had lost "a lot

of sight in [her] left eye," so she could no longer see to drive.  (Doc. 9-3, pp. 49–50).

Ms. Campbell stated that an eye infection caused by her liver disease and Sjogren's

disease had caused her vision loss.  (Doc. 9-3, p. 50).  Ms. Campbell was taking

medication for her eye infection; doctors believed she would get her sight back over

time.  (Doc. 9-3, p. 53).  Ms. Campbell stated that when she could drive, she drove

to do errands, but she had to complete them quickly or she would be too fatigued to

continue.  (Doc. 9-3, p. 50).  Ms. Campbell stated that she often was so fatigued by

2:00 p.m. that she could not do anything for the remainder of the day.  (Doc. 9-3, p.

49).

Ms. Campbell estimated that on good days, she spent four to five hours in a

"resting position."  (Doc. 9-3, p. 51).  On bad days, Ms. Campbell said that she spent

all day in bed, getting up only to use the restroom or to get something to eat.  (Doc.

9-3, pp. 51–52).  Ms. Campbell testified she had "bad days" at least four out of seven

days a week.  (Doc. 9-3, p. 52).  Ms. Campbell stated she could stand, walk, or sit

for 30 or 45 minutes before she needed a break, and she could lift a maximum of 15

pounds.  (Doc. 9-3, p. 51).

Patricia Oakes testified as the vocational expert at Ms. Campbell's

administrative hearing.  (Doc. 9-3, p. 54).  Ms. Oakes classified Ms. Campbell's past

work as a cook helper as medium work with an SVP of 2.  (Doc. 9-3, p. 54).  Ms.

Oakes testified that Ms. Campbell also had past work in a composite job that

consisted of medium work as a balloon machine operator with a SVP of 5 and light work as an inspector and hand packager with an SVP of 2.  (Doc. 9-3, p. 54).

The ALJ's first hypothetical to Ms. Oakes assumed an individual with the same education, training, and work experience as Ms. Campbell who could perform light work with the following restrictions:

> [She] could occasionally climb ramps, and stairs, but never climb ladders, ropes and scaffolds; she could frequently balance; occasionally stoop, kneel, crouch, and crawl; [and] she should avoid extreme cold, heat, vibration, and any hazards.

(Doc. 9-3, p. 55).  Ms. Oakes testified that this individual could not perform Ms. Campbell's past work.  (Doc. 9-3, p. 55).  Ms. Oakes testified that this individual could perform light SVP 2 jobs as a small parts assembler, with 176,000 available jobs nationally; a laundry folder, with 398,000 available jobs nationally; and a cashier II, with one million available jobs nationally.  (Doc. 9-3, p. 55).

The second hypothetical that the ALJ posed consisted of the vocational background and limitations posed in the first hypothetical and the additional limitation that the individual had the option to change posture from an upright position to a seated position as frequently as every 30 minutes.  (Doc. 9-3, p. 55). Ms. Oakes testified that the previous jobs of small parts assembler, laundry folder, and cashier II would be available, but the "sit/stand option" would reduce the number of the available jobs by seventy-five percent.  (Doc. 9-3, p. 56).

Ms. Oakes testified that an individual would need to stay on-task at work for

"at least 90 percent of the time in addition to regularly scheduled breaks." (Doc. 9-3, p. 56). Ms. Oakes stated regularly scheduled breaks included breaks every two hours for either 15 or 30 minutes or a 30 minute to an hour break for lunch. (Doc. 9-3, p. 57). Ms. Oakes testified that missing four days of work per month would preclude full-time work. (Doc. 9-3, p. 57).

## THE ALJ'S DECISION

The ALJ found that Ms. Campbell had not engaged in substantial gainful activity since her alleged onset date of November 6, 2019, and that she met the insured status requirements through December 31, 2024. (Doc. 9-3, p. 23). The ALJ determined that Ms. Campbell suffered from the severe impairments of primary biliary cirrhosis, Sjogren's syndrome, peripheral neuropathy, chronic kidney disease, and iron deficiency anemia. (Doc. 9-3, p. 24). The ALJ found that Ms. Campbell suffered from non-severe impairments of depression, anxiety, hypothyroidism, hypertension, gastroesophageal reflux disease, and coronary artery disease. (Doc. 9-3, p. 24). The ALJ found that Ms. Campbell's fibromyalgia was not a medically determinable impairment because her other impairments could have caused the symptoms associated with fibromyalgia. (Doc. 9-3, p. 26). Based on a review of the medical evidence, the ALJ concluded that Ms. Campbell did not have an impairment or a combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P Appendix 1.

(Doc. 9-3, p. 27).

Considering Ms. Campbell's impairments, the ALJ evaluated Ms. Campbell's residual function capacity.  (Doc. 9-3, pp. 27–33).  The ALJ determined that Ms. Campbell had the RFC to perform:

> light work . . . except she could occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds[;] she could frequently balance, occasionally stoop, kneel, crouch, and crawl.  She should avoid extreme cold, heat, vibration, and any hazards.  She require[d] the option to change posture from upright decision (standing or walking) to seated posture, or vice versa, as frequently as every 30 minutes.

(Doc. 9-3, p. 27).

Based on this RFC, the ALJ concluded that Ms. Campbell could not perform her past work as a cook helper or her composite job as a balloon machine operator, inspector, and hand packager.  (Doc. 9-3, p. 32).  Relying on testimony from the VE, the ALJ found that jobs existed in the national economy that Ms. Campbell could perform at the light exertional level including small parts assembler, laundry folder, and cashier II.  (Doc. 9-3, pp. 32–33).  Accordingly, the ALJ determined that Ms. Campbell had not been under a disability as defined by the Social Security Act since her alleged disability onset date of November 6, 2019.  (Doc. 9-3, p. 33).

## STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and her 'legal conclusions with close

scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If the court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

Ms. Campbell contends that the ALJ improperly rejected Dr. Tooson's opinion regarding her chronic fatigue because the ALJ found, in a conclusory manner, that Dr. Tooson's opinion was inconsistent with his treatment notes and with other evidence in the record and with Ms. Campbell's daily activities. (Doc. 14, pp. 1–3; *see also* Doc. 9-8, pp. 52–54). Although the ALJ's comments about Dr. Tooson's opinion are conclusory, the Court has considered the brief comments in the context of the ALJ's entire analysis of the medical evidence and in the context of the evidence in the administrative record. The administrative record does not contain substantial evidence to support the ALJ's conclusions regarding Dr. Tooson's chronic fatigue opinion.

When evaluating the persuasiveness of a medical opinion, an ALJ must consider five factors: supportability, consistency, relationship with the claimant, specialization, and "other factors." 20 C.F.R. § 416.920c(1)-(5); *see Harner v. Comm'r of Soc. Sec.*, 38 F.4th 892, 897 (11th Cir. 2022).[20] The most important factors are supportability and consistency, and an ALJ must "explain how [she] considered the supportability and consistency factors for a medical source's medical

---

[20] In her brief, Ms. Campbell discusses the "treating physician rule." (Doc. 14). That rule applied to disability applications filed before March 27, 2017. Because Ms. Campbell filed her disability application after March 27, 2017, the Court must apply the new regulation found in 20 C.F.R. § 416.920c. *Harner v. Comm'r of Soc. Sec. Admin.*, 38 F.4th 892, 894 (11th Cir. 2022).

opinions . . . in [her] determination or decision."  20 C.F.R. § 416.920c(b)(2).[21]

When considering the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are . . . the more persuasive the medical opinions . . . will be."  20 C.F.R. § 416.920c(c)(1).  And when considering the consistency of a medical opinion, "[t]he more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be."  20 C.F.R. § 416.920c(c)(2).

Here, the ALJ stated that "when evaluating the persuasiveness of the medical opinions . . . [she] consider[ed] supportability, consistency, relationship with the claimant, specialization, and other factors in accordance with 20 CFR 404.1520(c) and 415.920(c)."  (Doc. 9-3, p. 30).  In a lengthy review of medical evidence, the ALJ discussed Dr. Tooson's chronic fatigue opinion, stating:

> Dr. Tooson reported that the claimant had primary biliary cholangitis and was on chronic lifelong medical treatment to prevent intractable pruritus, sleep disturbance, fatigue, and jaundice.  He reported that [Ms. Campbell] would constantly experience fatigue or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks[;] was incapable of even low stress jobs[;] could stand/walk less than two hours and sit about four hours in an eight hour day[;] would need a job that permitted shifting positions at will from sitting, standing, [and] walking[;] would require hourly

---

[21]  An ALJ does not have to articulate how she considered the other three factors.  20 C.F.R. § 416.920c(b)(2) ("We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section . . . when we articulate how we consider medical opinions . . . in your case record.").

> breaks of one to two hours each in order to lie down or sit quietly[;] and would miss more than four days per month from work as a result of her impairments or treatment.

(Doc. 9-3, p. 29).   The ALJ found that Dr. Tooson's opinion was not persuasive because the opinion was not "consistent with his treatment notes or the other evidence of the record" and was not "supported with the claimant's activities of daily living as discussed above."  (Doc. 9-3, p. 31).   The ALJ did not elaborate on these findings; the record contradicts them.

Dr. Tooson's treatment notes are not inconsistent with his chronic fatigue opinion.   Dr. Tooson's September 2020 treatment notes reflect Ms. Campbell's diagnoses of primary biliary cirrhosis, anemia, and sleep apnea and state that associated symptoms included "easy fatigability."   (Doc. 9-8, pp. 91, 93).   Dr. Stidham referred Ms. Campbell to Dr. Tooson for treatment of anemia.   (Doc. 9-8, p. 91).  Blood tests are used to identify anemia.

> A low hemoglobin count is a commonly seen blood test result. Hemoglobin (Hb or Hgb) is a protein in red blood cells that carries oxygen throughout the body.
>
> A low hemoglobin count is generally defined as less than 13.2 grams of hemoglobin per deciliter (132 grams per liter) of blood for men and less than 11.6 grams per deciliter (116 grams per liter) for women. . . .
>
> In many cases, a low hemoglobin count that's only slightly lower than normal doesn't affect how you feel. A low hemoglobin count that's more severe and causes symptoms might mean you have anemia.

https://www.mayoclinic.org/symptoms/low-hemoglobin/basics/definition/sym-20050760        (last        visited        Feb.        13,        2024);        *see        also*

*https://www.ncbi.nlm.nih.gov/books/NBK499994/* (last visited Feb. 13, 2024) ("Anemia is a reduction in hemoglobin (Hb) or hematocrit (HCT) or RBC count. It is a presentation of an underlying condition and can be subdivided into macrocytic, microcytic, or normocytic. Patients with anemia typically present with vague symptoms such as lethargy, weakness, and tiredness. Severe anemia may present with syncope, shortness of breath, and reduced exercise tolerance.").[22]   Ms. Campbell's Hgb reading was 8.7 on August 25, 2020 and 7.9 on August 12, 2020, hence Dr. Stidham's diagnosis of anemia, Ms. Campbell's prescription for iron replacement therapy, and Dr. Stidham's referral of Ms. Campbell to Dr. Tooson to explore the cause of her anemia.  (Doc. 9-8, p. 91).[23]

Dr. Tooson reviewed the nearly two-dozen medications that Ms. Campbell was using.  (Doc. 9-8, p. 92).  He noted Ms. Campbell's weight loss and described her as "FRAIL APPEARANCE, Thin, not cachectic."  (Doc. 9-8, p. 93).[24]  Dr. Tooson rated Ms. Campbell's level of risk as "extensive" and indicated that her

---

[22] In addition to fatigue, Ms. Campbell was experiencing heart palpitations.  (Doc. 9-8, p. 91).

[23] On July 15, 2020, Ms. Campbell's Hgb was 6.7, and her "macrocytic anemia" was described as "acutely worsened."  (Doc. 9-8, p. 67).  Dr. Italiya placed Ms. Campbell on iron replacement therapy.  (Doc. 9-8, p. 67).   The medical record from this date indicates that Ms. Campbell had a walker at home. (Doc. 9-8, p. 68).  On July 27, 2020, when she was discharged from the hospital, Ms. Campbell's Hgb was 9.4.  (Doc. 9-8, p. 69).  Her discharge notes include an instruction for Ms. Campbell to use a walker or cane.  (Doc. 9-8, p. 69).

[24] Dr. Tooson had perspective for Ms. Campbell's weight loss and appearance because he had treated her primary biliary cirrhosis between 2012 and 2018.  (Doc. 9-8, p. 82; Doc. 9-9, p. 31).

treatment needs were "multiple." (Doc. 9-8, p. 93). He referred Ms. Campbell to Dr. Fettig for examination of her liver, advised her to continue her GI medications, and instructed her to return in six months. (Doc. 8-9, p. 93).[25]

Consistent with his treatment record, in his medical source statement, Dr. Tooson reported that Ms. Campbell was "on chronic life-long medical treatment to prevent intractable pruritis (itching), sleep disturbance, fatigue, [and] jaundice," and he opined that this treatment "may be contributing to chronic fatigue symptoms." (Doc. 9-8, p. 52). Dr. Tooson opined that Ms. Campbell's chronic intractable itching "day [and] night" and her sleep deprivation made her "[i]ncapable of even low stress jobs" and would require hourly breaks. (Doc. 9-8, p. 53).

Other medical evidence in the administrative record also supports Dr. Tooson's opinion. In rejecting a medical opinion as "inconsistent" with the record, an ALJ must "identify a genuine inconsistency." *Schink v. Comm'r of Soc. Sec.*, 935

---

[25] In his brief, the Commissioner states: "It appears that Dr. Tooson examined [Ms. Campbell] on only one occasion in September 2020, when he evaluated [her] for anemia." (Doc. 17, pp. 10-11). Though the administrative record contains only the September 2020 record of Ms. Campbell's visit to Dr. Tooson, Dr. Tooson indicated in his chronic fatigue medical source statement that he had had more than five visits with Ms. Campbell and that his relationship with her began in 2012. (Doc. 9-8, pp. 52, 54). The Court has not found information in the record that indicates that the ALJ requested records from Ms. Campbell's other appointments with Dr. Tooson. *See Sims v. Apfel*, 530 U.S. 103, 111 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits. . . ."). Three medical records confirm that Ms. Campbell had multiple visits with Dr Tooson - an August 2020 record, (Doc. 9-8, p. 95), a July 2020 record, (Doc. 9-8, p. 82), and an August 2012 record, (Doc. 9-9, p. 31).

F.3d 1245, 1262-63 (11th Cir. 2019) (internal quotations and citations omitted).[26]

Ms. Campbell's records show that between 2018 and 2020, she consistently received

diagnoses of primary biliary cirrhosis (liver disease) and Stage 3 chronic kidney

disease and reported related symptoms of fatigue, insomnia, itching, bruising, and

jaundice. (Doc. 9-8, pp. 6, 8, 10, 14–15, 31, 34, 67, 70, 77, 78, 82-85, 88-90, 95-98,

104, 111, 117-18, 123-24, 130).[27] Though the ALJ correctly noted that many of Ms.

Campbell's medical records reflect visits in which she sought treatment for sinus-

related issues and other illnesses, (Doc. 9-3, pp. 29-30), doctors also routinely noted

Ms. Campbell's liver and kidney disease and maintained her prescriptions for

treatment of those chronic conditions and related symptoms.[28]   Ms. Campbell's

---

[26] Although the Eleventh Circuit decided this case applying the pre-2017 "treating physician rule," the Eleventh Circuit's discussion regarding the requirement for a genuine inconsistency remains good law. *See Jemison v. Comm'r of Soc. Sec.*, No. 4:20-cv-1914-SGC, 2022 WL 989021, at *5 (N.D. Ala. Mar. 31, 2022) (applying the new regulations and citing *Schink* for the proposition that the ALJ must identify a genuine inconsistency).

[27]     *See*   https://www.kidneyfund.org/all-about-kidneys/stages-kidney-disease/stage-3-chronic-kidney-disease-ckd (last visited January 19, 2024) (symptoms of stage three kidney disease include "[f]eeling weak and tired," swelling in the hands and feet, dry itchy skin, lower back pain, trouble sleeping, and restless leg syndrome).

[28] For example, Ms. Campbell's records reveal that she was prescribed Atarax in February 2020 to treat her itching. (Doc. 9-8, p. 5). Common side effects of Atarax are drowsiness, dizziness, and blurred vision. https://www.rxlist.com/atarax-drug.htm (last visited Feb. 14, 2024). In November 2019, she was prescribed Cetirizine to treat itching. Side effects of this medication include                drowsiness                and                fatigue. https://www.ncbi.nlm.nih.gov/books/NBK549776/#:~:text=Cetirizine%20is%20a%20medication %20used,over%2Dthe%2Dcounter%20medication (last visited Feb. 14, 2024). At other times, she was prescribed desonide and hydroxyzine for itching. (Doc. 9-8, pp. 92, 105, 117, 124; Doc. 9-9, p. 8). Lab results from August 15, 2019 show a bilirubin value of 5.6, significantly above the high end of the reference range. The result indicated that Ms. Campbell was icteric, meaning she had jaundice. (Doc. 9-8, p. 19). Lab results from August 31, 2019 show a creatinine value of 1.66,

chronic itching, associated with her PBC, impacted her sleep.  (Doc. 9-8, pp. 10, 14–15, 31).  Treatment records reflect a history of difficulty sleeping.  (Doc. 9-8, pp. 10, 14–15, 124, 126; Doc. 9-9, p. 34).  Ms. Campbell testified that her doctors tried to find medications to help her sleep, but she had few options because her liver and kidney disease restricted the medication that was available to her.  (Doc. 9-3, p. 47).[29]  These medical records are consistent with Dr. Tooson's opinion that Ms. Campbell's fatigue and insomnia could have interfered with her ability to work full-time, would have required hourly breaks at work, and could have caused her to miss more than four days a month.

These medical records also demonstrate that Ms. Campbell did not have insurance, and her lack of insurance limited her treatment options.  (Doc. 9-8, pp. 14-15, 17, 82-83, 90).  It appears she visited doctors when she was suffering from a viral or bacterial infection, and she used those visits to seek prescription renewals for treatment of her liver and kidney disease and the symptoms related to those

---

more than 50% higher than the high end of the reference range.  (Doc. 9-8, p. 16).  One year later, she had a creatinine value of 1.36, well above the high end of the reference range (.09).  (Doc. 9-8, p. 119).  "If kidney function is not normal, the creatinine level in your blood will increase. This is because less creatinine is excreted through your urine. . . . A normal result is 0.7 to 1.3 mg/dL (61.9 to 114.9 µmol/L) for men and 0.6 to 1.1 mg/dL (53 to 97.2 µmol/L) for women." https://www.mountsinai.org/health-library/tests/creatinine-blood-test#:~:text=Creatinine%20is%20a%20chemical%20waste,body%20entirely%20by%20the%20kidneys (last visited Feb. 14, 2024).

.
[29] Ms. Campbell's liver and kidney disease also limited her options for pain medication; she could use only Tylenol.  (Doc. 9-3, p. 47).  Her liver disease limited treatment options for her kidney disease.  (Doc. 9-9, p. 11) (discussing Ms. Campbell's kidney disease and stating that she was not a "great candidate for Ocaliva given cirrhosis and itching.").

diseases.  Thus, the fact that Ms. Campbell's medical records reflect complaints of

viral or bacterial illnesses does not diminish her need for treatment for her chronic

conditions, and her lack of insurance helps explain her lack of consistent treatment

for those chronic conditions.  *See* SSR 16-3p (stating that the ALJ "will not find an

individual's symptoms inconsistent with the evidence in the record" for failure to

seek medical treatment "without considering possible reasons" for her failure to seek

treatment, including "that the individual may not be able to afford treatment and may

not have access to free or low-cost medical services").

Dr. Tooson's opinion also was not inconsistent with Ms. Campbell's daily

activities.  In addressing Ms. Campbell's daily activities, the ALJ stated:

> In a Fatigue Questionnaire, the claimant stated she did not have
> difficulties caring for personal needs . . . .  She stated that she [ate]
> meals, washe[d] dishes and clothes, [bought] groceries, [paid] bills,
> watche[d] television and [went] to bed.  She stated she itche[d] all night
> and could not be still when lying down[;] . . . could walk, drive, and
> shop alone[;] . . . [and] had no problems walking[] but had trouble
> lifting, bending, standing, sitting, kneeling, climbing stairs,
> concentrating, and using [her] hands . . . .  At the hearing, the claimant
> testified that she [was] unable to work because of brain fatigue, pain,
> and swelling in her abdomen due to liver and kidney disease.  She
> testified that she had lost sight in her left eye two months prior and
> could no longer see well enough to drive.  She stated she was taking
> steroid drops and believed she would get her sight back.  She stated she
> help[ed] her mother with her care, but that her mother ha[d] also been
> helping her out a lot.  She testified that she was independent with her
> self[-]care.  She testified that she could stand and walk 30-45 minutes
> before needing a break [and] could sit for about the same.  She stated
> she could lift a maximum of 15 pounds.

(Doc. 9-3, p. 28).  The ALJ's summary of Ms. Campbell's activities of daily living

omits evidence that substantiates her reports of her limitations, and the ALJ did not explain how Ms. Campbell's daily activities were inconsistent with Dr. Tooson's opinion.

Ms. Campbell testified that she could do light cleaning, small chores, and grocery shop, but that she would have to lie down afterward for at least 30 minutes to an hour after each task, and she had to do these activities quickly or she would be too tired to continue.  (Doc. 9-3, pp. 49–51).  Ms. Campbell also testified that when she did chores, by 2:00 in the afternoon, she often was too fatigued to do anything but rest.  (Doc. 9-3, p. 49).  Ms. Campbell testified that on a good day she spent four to five hours lying down, and on bad days—which were four days a week—she spent the entire day in bed other than to use the restroom or to get food.  (Doc. 9-3, pp. 51–52).  An ALJ may not cherry-pick the parts of a claimant's daily activities that support her conclusion but disregard testimony regarding limitations in performing those daily activities.  *See McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986) ("It is not enough to discover a piece of evidence which supports [a] decision, but to disregard other contrary evidence[,]" and a decision is not supported where it was reached "by focusing upon one aspect of the evidence and ignoring other parts of the record");  *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to

a disability finding.").  Additionally, "participation in everyday activities of short duration . . . does not disqualify a claimant from disability." *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997); *see also Haugen v. Astrue*, 497 F. Supp. 2d 1315, 1327 (N.D. Ala. 2007) ("The ability to watch television, do occasional shopping, or perform other sporadic activities does not mean the plaintiff is not disabled.").

The entirety of Ms. Campbell's activities of daily living are consistent with Dr. Tooson's opinion that Ms. Campbell would need breaks every hour for at least one or two hours, that she could not stand or sit for long periods of time, and that she would be absent from work for at least four days a month.  Ms. Campbell's testimony that she had at least four days in a week in which she would be in bed for the entire day is consistent with Dr. Tooson's opinion that Ms. Campbell would miss work at least four days per month.  (Doc. 9-3, pp. 51–52; Doc. 9-8, p. 54).

The ALJ provided "broad conclusions without explaining h[er] analysis regarding consistency and supportability." *See Works v. Saul*, No. 4:19-cv-01515-MHH, 2021 WL 690126, at *15 (N.D. Ala. Feb. 23, 2021).  An ALJ does not satisfy her obligation to "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions," 20 C.F.R. § 416.920c(b)(2), by stating only that a medical opinion is generally inconsistent with the medical record or the claimant's daily activities.  Though 20 C.F.R. § 416.920c(b) provides that as a practical matter, an ALJ cannot articulate for each medical source how the ALJ

considered all of the § 416.920c(c) factors, § 416.920c(b) requires more than a conclusory statement, at least with respect to the supportability and consistency factors so that a reviewing court may make a meaningful assessment of a challenge to an ALJ's evaluation of the persuasiveness of the medical opinion.  Because the ALJ did not provide sufficient reasoning to demonstrate that she conducted a proper legal analysis in evaluating Dr. Tooson's opinion and because the ALJ did not account for evidence inconsistent with her conclusions, remand is warranted.  *See Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991) (The ALJ's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal"); *see also Spaar v. Kijakazi*, No. 5:20-cv-94, 2021 WL 6498838, at *5, *report and recommendation adopted*, 2022 WL 141613 (S.D. Ga. Jan. 14, 2022) (concluding that error in failing to address the supportability of medical opinions could not be harmless under the new regulations where the medical opinions, if adopted as a component of the claimant's RFC, could have resulted in the difference between performing light work and a disability finding).[30]

## CONCLUSION

For the reasons discussed above, the Court finds that the ALJ did not properly evaluate Dr. Tooson's opinion under 20 C.F.R. § 416.920c.  Accordingly, the Court

---

[30]  Given this remand, the Court will not address the other issues Ms. Campbell raised in her brief.

reverses the decision of the Commissioner and remands this case for further proceedings consistent with this opinion.

**DONE** and **ORDERED** this February 16, 2024February 16, 2024.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE